Appeals of Court Opposing Counsel My name is Roger Sanders. I'm here with Linda Surratt, who is a representative of the estate of Lisa Surratt. I'm pleased to represent her interest. I will apologize to you for my roughness. It's been a long time since I've been here and I took this case over for active duty. The gentleman's called back to active duty, so I kind of got the case in active duty, I would think. Yes, Your Honor, where he went, I believe so. I overlooked an argument that I want to raise. It's in the briefing. It's a Schmerber argument, but it's one that I did not put in, and so I do want to call your attention to it. Was it addressed by your opponent? I don't believe so, Your Honor, and if the court believes it's inappropriate. Is this the first time you're raising it? It is the first time I will mention it. It's raised implicitly in the facts. There's just another way of arguing the facts. It has to do with the exigency of the circumstance, which Schmerber, Anderson, all of the other Supreme Court cases do address. I appreciate that this is the first time that I've articulated it, and I think that's... Was it argued to the court below? It was not. All right, well, then you're not allowed to argue it. Okay. Thank you, Your Honor. The case we have presented essentially says that there are five contours of the law that were clear to the officers and to the courts and did not require a specific articulation. That argument may be narrowed to say against the charge that this is just a general statement that in fact it is not, and so I would like to take the five sets of contours that Anderson calls for, namely the United States Supreme Court, the Fifth Circuit, the Hodson case that was decided by the Utah Supreme Court, and then two sets of Texas statutes. Those are the five, but Schmerber actually answers the entire case in my judgment, and if I may make some specific reference to that, Schmerber was the first case, as the Court knows, which addressed the difference between invasion into property and personal or body rights. Although the Supreme Court had another case before, a few years before, they specifically say that this is the first time that they address it. It's on a clean slate, and what they pointed out was that the Fourth Amendment is taken in the context of the Fifth Amendment. That is, the Fifth Amendment says you can't force somebody to come in and testify against them, but when you're taking evidence from their person, then the question is on what basis can you in the Fourth Amendment justify going into a body, a body cavity or beneath the surface. The Supreme Court and Schmerber laid out some very careful requirements. The first was that there had to be some sort of serious belief that you should be able to go, and you're going to find the evidence there. The second is that there be some carefulness, because there's a balance between what is at risk in the human body versus what the State may gain from it. Yeah, what I don't understand is really what the officers do wrong. They thought that Syrett had swallowed the drugs, and they had two fears, really. One was that she's going to kill herself if she swallows these drugs, and second, they want to recover the drugs. What was wrong with the police thinking along those lines? Well, Your Honor, I don't know that there's any record evidence that they were concerned that she was going to kill herself. Well, but if you swallow a large quantity of drugs, that pretty well follows, doesn't it? Well, Your Honor, there is no evidence that they knew she had swallowed it. In the record, it says one of the officers said he heard something drop, and the other officer says, let's get them out one by one. So there wasn't really a sufficient basis even to believe that there was evidence in her mouth. This is on page two of counsel's brief. There is a reference to it's behind her back. So the only record evidence we have is it should either be on the floor or behind her back, not in her mouth. I thought the officers saw some evidence that she had something in her mouth. Not at the beginning. What I recall, Your Honor, is it hit the floor, they heard a sound, and they thought she'd gotten her hand loose, and it was behind her back. And those are the two statements that are on counsel's brief on page two. Well, at some point, they figured out she had it in her mouth. Yes, that is absolutely the truth, Your Honor, but it's after the application of the force. They gave her three seconds initially to open her mouth. I thought they applied the force to the neck because they believed the drugs were in her mouth about to be swallowed. We may speculate that that's the case, and it may be a fair inference to draw, Your Honor. I'm not saying no, but when the court addresses what was the evidence in advance, what we had objectively was a sound and something behind the back in a direction. Let's get them out one by one. They did, in fact, go, and I think it's . . . You're saying they fortuitously just started applying that force to the neck? I mean, the district court, which agreed with you that there was a . . . it found excessive force, but I didn't read it to be saying that they didn't have a basis for believing she had the drugs in her mouth. It was not addressed by the district court, Your Honor. I think the court is correct about that, and I'm not saying that that's an unreasonable inference to draw, but when one asks me to speak on behalf of my client, there was not evidence to say it's in her mouth. There was evidence to say it was either on the floor or behind her back. It is clear at some point they must have believed that, and I think that's fair, and they did begin to press, but I couldn't find any case in the Fifth Circuit which gave so little time for a person to respond, and when they began to press, we don't know. We simply don't know what was keeping her from responding. Was it because it was already in her throat or because it was being forced down, or she simply didn't want to open her mouth? Either way, in Schmerber, the court says if you're going to go into a body cavity or go below the surface, an invasion of the body must require that there be something that is essentially risk-free or relatively risk-free, pain-free, and trauma-free. None of those three things were available here, even as a matter of common sense, but certainly not after the 1977 case that was cited by the Hudson, Utah Supreme Court, and 1995 Hudson Supreme Court case. Both of those were on the books, and it, with respect to ... That didn't involve somebody being, their life being in danger, though, did it? In Hudson, I believe that the person was pulled out of the car and thrown to the ground. That's my recollection. The concern, though, that was expressed in the court, it's clear. I mean, it's a Utah Supreme Court case, and the California Court of Appeals had held the same thing 20 years before. We know as a practical matter, there are warnings all over the place for kids not getting plastic or small things to ingest. Choking hazards are clear and obvious, and they do not require a court of appeals or the Supreme Court to point out that specific thing. Well, your client certainly didn't respond that way. In fact, I'm a little confused, because in your brief, you say you're complaining about excessive force by using a potentially deadly force against a handcuffed, passive, non-threatening woman. That's not what we have here. She was fighting. She wasn't handcuffed. She got her hand out. Later. That's correct, Your Honor. Right. Later, but not initially. Well, initially, they didn't try that. They heard something fall. They saw her reach into her breeches and pull something out and put it in her mouth. I don't believe they saw that. I believe they surmised that. The camera would show it, though, and I believe the court's correct. I'm not trying to argue with the court. That's what they said. Well, that's what they said later, but the camera was what captured that. They didn't have direct information about what she had done, and it is true that she pulled her hand outside because the handcuff was not put on tight enough, apparently, to restrain her, but as the officers were seeing it, which is what we are judged to judge them by, as they were seeing it, as it unfolded, before they began to apply force, they had made some conclusions, apparently, and they went after her. The Rochin case is a really instructive case, in my judgment. It precedes Schmerber, and it basically says when someone is beyond the traditional notions of fair play and decency as we understand it, if their body is invaded, it can shock the conscience. Here we have a lady who is essentially brain dead within one minute, less than one minute, after the officers come to try to search her. There was no basis for the search. There was no need for the search. They would be able to retrieve it easily, either at the hospital where she could have been confined for fecal elimination, or if they had simply taken her on to the Grayson County facility where she was scheduled to be searched by a female police officer. But if she swallowed it, it could take a couple days for that to pass through her system. Your position, and the Utah court talks about this, but it is basically that they could have detained her for two to three days while waiting to see if this substance they suspected that she had swallowed had passed through her system? In comparison to her death, yes, Your Honor. What basis would they have to hold her for three days? Because they have a... Because you are saying there is no basis to believe there was any drugs involved at all. No. With respect, Your Honor, that is not what I am saying. I am saying that what the officers saw initially was no possession in the mouth. They had already had a tip that she was possessing drugs in her underwear, and they set up this traffic stop in order to arrest her. So they had knowledge that drugs were in or about her possession. They had probable cause, in my judgment, to believe that she could be stopped. And so I think they could have held her either for the acquisition of the evidence or, after reviewing the video camera, they could have seen that she had done exactly what the court has said, that she put it in her mouth. I am just trying to keep straight what the officers saw and when they saw it. Schmerber requires whatever the basis for going in, something that is safe, that is simple and relatively commonplace. That was the... Let me ask you this. If the officers did have grounds to think that she had drugs in her mouth... Yes, sir. ...wouldn't they have...wouldn't it be reasonable for them to try to get her to open her mouth? And if she wouldn't do it, to force it open? Well, up to one point, I think the Court is precisely correct, and this Court has held that measured force is appropriate. And measured force to try to squeeze or to get it out of the mouth, I believe absolutely. But there is a balancing test here between the risk run and the benefit gained. And in this case, it gained nothing prosecutorially for them to gain that evidence. They would have sufficient evidence by the video cam to see what she had done. And whether they got the evidence one day... The video cam wouldn't show what was in the...wasn't a baggie she swallowed? What was... It would show she put something in her mouth... Exactly. ...but they wouldn't know what it was. Not until the fecal elimination. That's correct, Your Honor. I mean, look, really, as a practical matter, we either get the baggie from an autopsy or we get the baggie from fecal elimination. In a civilized society where you have people presumed to be innocent before they are convicted, death is not an acceptable measure of what should happen in advance of some adjudication. If she'd opened her mouth, it probably wouldn't have happened, would it? Your Honor, we don't know why she didn't open her mouth. We don't know whether the first time squeezed it down. We simply don't know. The risks are too great when messing with the aeroids, which is what Judge Mazant found. You're saying police can apply no force whatsoever when they suspect someone swallowed evidence? Not at all, Your Honor. I'm saying that they will use measured force, which is... What would have been appropriate? I think trying to squeeze that open and see whether it would work. And if it didn't, then you have alternatives. Squeezed how different than the way they... They went to the neck, Your Honor. And what happened, for whatever reason and however it happened, it seemed to drive that baggie down her throat. But aren't they trained to use the soft hands method on the jaws? Your Honor, I don't know how they're trained. I mean, I understand the Court's point, but I can't answer that knowledgeably, and it's not in the record on what soft method there is. There are issues... They taught the Heimlich maneuver also, didn't they? Well, the Heimlich maneuver is one that's well known. I've used it in a restaurant to save somebody. I know how that stuff works, but as a practical matter, those are imprecise. And what Schmerber, Neville, and McNeely all speak to is the care which must be given to a citizen who is brought under federal or, excuse me, under custody arrangements. Neville said that it needs to be safe, secure, and simple. I may have those words wrong. And in Schmerber, it basically says you can do it under stringently controlled circumstances. No one could argue that these were stringently controlled. It's not as if they were taking something like body fluids through a medical procedure. That's what Schmerber seemed to require, and the Supreme Court opened the door a little bit, but not broadly, not to say that every body cavity or body search can be done with imprecise methods and means, particularly not when they're as dangerous and clearly dangerous as these were here. The district court respectfully erred by not understanding or addressing the fact that this was a body cavity search, a body intrusion search. The rules were clear since 1966, added to in 77, in 95, and a series of other cases since. I thought your whole argument's been excessive force under the Graham v. Conner test. It is a part of our argument. What that does is illuminate that the lady was not resisting. She wasn't a danger to anyone, and so in those circumstances... She was resisting. She was fighting. She was trying to save her life, Your Honor, but she wasn't resisting arrest. She wasn't trying to flee. The cases that this Court has dealt with... She was resisting them taking her out of the car. She was resisting not taking her out of the car, but she was dragged out of the car. She was resisting trying to keep her life, I think, if you view the evidence in the way most appropriate to the appellant. Thank you, Your Honor. I believe my time is up. Thank you. You have some rebuttal time. Thank you, Your Honor. Go ahead. May it please the Court, opposing counsel, before I start on the merits of our argument since Mr. Sanders has indicated his client is here, I did want to start the argument by just acknowledging that this was a tragic case. Can you keep your voice up just a little bit? Yes, Your Honor. I wanted to start by acknowledging that this is a tragic situation, and as I rush to the legal arguments, I don't want to brush past that since it affects human beings who are here with us today. Turning, though, to those legal arguments, what I'd like to do in response to appellant's argument is first address what it means for a law to be clearly established. Secondly, I would like to turn and show that regardless of how we define the right at issue, whatever level of generality we use here, the district court was incorrect, and this court can affirm summary judgment on the ground that there was not an excessive force violation here. And then thirdly, if there's a little time left, I would like to address the proper summary judgment burden and sort of reframe our perspective of the record with that. So starting with the clearly established prong and analysis, the U.S. Supreme Court just held in January in White v. Pauley that the right at issue, when we're determining whether or not a right was clearly established, must be defined with particularity. It can't be just a general proposition of law. And what that requires, and we know now from recent Supreme Court case law, is it requires some precedent. Whether that's robust consensus of persuasive authority or whether that is a controlling authority, they require some precedent showing that what the officers did was unconstitutional. There is a minor exception to that in what the judges are calling, the justices have called an exceptional or an obvious case. In the White v. Pauley case, for example, the United States Supreme Court rejected the very argument that appellant seems to be making here, which is to look at Garner and to look at Graham and to assess the risk factors, and based on that, to say that the law was clearly established at the time. But as I'm listening to the argument from opposing counsel and reading the briefs, I can't help but get the sense that this is simply a recitation of the general law and expecting that that clearly established the law. And it's important to note, too, that appellant's theory in saying that there wasn't case law out there authorizing the officer's use of force in this case flips the standard on its head. It's not that the court needs to see case law that authorizes this conduct. It's that there needs to be case law that prohibits this conduct, and there is an absence of such case law here. And as the district court relied on below correctly in determining that the law was not clearly established or at least that it did not clearly prohibit the conduct at issue here, there were a couple of cases, one being the Espinoza case from this court in 1960, which authorized an even greater use of force than what we had here. There, the court noted that the federal officers there had obtained the evidence from the defendant's mouth by grabbing the defendant about the throat, choking him, and attempting to pry open his mouth by placing pressure against the jaw and nose. The district court determined that the officer's efforts used no more force than was necessary under the circumstances, and this court affirmed it. So that case is out there authorizing the conduct of the officers. Let me ask you something. Tell me from the record. When and what stage did the officers suspect that she had something in her mouth? What happened here is that the item dropped on the floor and Officer Stevens heard it, and he called Officer Carver and his radio to come back over. The door of the vehicle was open and he heard it from outside or what? Yes, he was outside. He heard the item drop because Officer Stevens was the second officer to get there, and he walked up as Officer Carver had just placed the passenger with Ms. Surratt in. And so Officer Carver had said, you know, Officer Stevens, take a look at them. They may be hiding stuff. We heard they may be hiding something in their, I think it was their brassiere. So he hears an item drop at some point in this, and he radios Officer Carver to come back. So Officer Carver comes back to the passenger side backseat of Officer Stevens' car, and Officer Stevens, referring to Ms. Surratt, says, she's got her britches pulled up. It's in her pants. And then Carver reached across to grab her right hand and said, yeah, she's got it behind her back right here. At that point, Officer Carver shined his flashlight towards Ms. Surratt and instructed her, open your mouth. Well, Ms. Surratt refused to comply at that point and kept her mouth closed. So I'm not sure what it was that prompted Officer Carver to know that she had something in her mouth. But he did, before reaching for her mouth, shine the flashlight and say, open your mouth. And that's displayed in the video evidence. What fell on the floor? You know, I don't recall, Your Honor, what it actually was that hit the floor. There just was something that hit the floor, which is what alerted Officer Stevens that it might be drugs under the circumstances. I don't know for sure whether that actually turned out to be drugs or not. It wasn't the handcuffs. She only got out of one side. She only got out of one handcuff. That's right. And, you know, at that point— Is there anything in the record about whether there's any training on what approach officers should use to dislodge objects in this situation? You know, I don't recall, Your Honor. I don't. How do you respond to the district court's conclusion that the government's interest was limited here because there were other means to ultimately obtain the evidence in a more controlled environment? The primary way I would respond is that it flips the qualified immunity inquiry on its head. I'm talking about just on the reasonableness, which you want us to address, just on whether there's a violation. Yes. Forget clearly established for a second, but on whether the force was unreasonable. The district court found excessive force in part because he says the government's interest was limited, basically along the lines of what the Utah court said. So how do you respond to that? Through case law. This court, the Fifth Circuit, not a 1995 case from the Utah Supreme Court, but this court, in 2016 in a case cited by appellant in the reply brief is Brothers v. Zoss. And in that case, the officers, this is an excessive force case where the officers forced a person out of his car. And the officers, because the inhabitant of the vehicle was obese and disabled and intoxicated, when they pulled him out, he fell and landed on his stomach or back, and he ended up being rendered paralyzed. And this court, in analyzing that use of force, concluded that it wasn't unreasonable or excessive. Even though it resulted in that serious injury, the court noted that force is not necessarily deadly even where it results in death. I agree it's not deadly. I don't think you're going to understand my question. I thought the district court said the government's interest in applying force was limited because it could have taken her to the station, tested her blood, or waited a couple days until this passed through her system. Yes. Do you agree with the district? No, I disagree with that. The law doesn't entitle a suspect a five-minute waiting period to destroy evidence. Officers have a legitimate objective to preserve evidence. If we think about folks in the world, it's not that people committing crimes are all naive and silly and unintelligent. There are people who are crafty and who are sophisticated and who plan to execute things. So the government has to take the opportunities they have sometimes to preserve evidence or else they'll never get it. If you give everyone five minutes to destroy the evidence, they're going to destroy the evidence. And even if you can take someone back later on and give them a drug test or test a urine sample or do any things along those lines, the test here is reasonableness. The test here isn't what's the least offensive, least intrusive, least offensive way to procure evidence from a suspect who's suspected of having it. Does that answer your question, Your Honor? It does. So what's probably briefly worth discussing, unless Your Honor disagrees and can direct me otherwise, is that Appellant relies a lot on Hope v. Pelzer. So it bears brief mention of how Hope is worked out in the later cases. Because this court in Morgan v. Swanson in 2011, which would have been right after the Ashcroft v. Al-Kid case came out, it noted that Hope v. Pelzer is in tension with a couple of more recent Supreme Court cases. Hope said in dicta, as this court noted, that sometimes even generally articulated rights can provide clearly established law for purposes of qualified immunity. And in that case, though, based on circuit case law, not based on the general proposition of law, found that the law was clearly established. But that was in tension with the later statements by the U.S. Supreme Court in the Brousseau case, where qualified immunity was affirmed because there was no case law that squarely governed the facts at issue. And then in the Al-Kid case, as this court in Morgan v. Swanson noted, there was an exasperated tone that the United States Supreme Court had in emphasizing that you can't define the right at issue with an impermissible amount of generality. And so now if we fast forward to 2017, there have been several cases from the U.S. Supreme Court and this court that have addressed that issue. And it seems clear now that when we're talking about hope, the limited effect that it could have on our facts here is simply to ask the question, was this an obvious case? And if the answer is no, then we know that you need the precedent that we were discussing just a moment ago that clearly establishes that the officer's conduct was unreasonable or clearly excessive. Another case that's turning to— Is there any law—in other words, your opponent is saying that at some point a policeman should have known that they were applying too much force, that after the initial attempt to get her to open her mouth, they should have stopped and then it became excessive. Is there any law on when it would become excessive? It was not excessive. This case is a lot like the—in some respects, in this regard at least, like the Pool v. City of Shreveport from this court in 2012 case. It was also a traffic stop excessive force case, and that was a case where the officers dislocated the suspect's arm in arresting him, even though he was pulled over initially because he had—unluckily, I might add—thrown something out his car window and it hit an unmarked police car driving behind him who then radioed a marked police car to come, and they had probable cause for some sort of violation in an address with him. But in there, he—the court noted that he escalated his resistance over time, and the force was escalated proportionately with the resistance. And once the officers realized that his arm had been dislocated, at that point they turned to life-saving or injury-repairing measures, and that's what happened here. As soon as the officers saw that Ms. Surratt's arm was limp and that her face was turning blue, they were no longer trying to get any sort of evidence from her. This was all about saving her life. That's the only reasonable inference to draw from the timing of how things played out as well as the comments that were being made by the officers at the scene at that time. The last point that I would raise before turning back over to opposing counsel is that at summary judgment, it's the plaintiff's burden to rebut a claim of qualified immunity, and that this court has called that, just as recently as this past year, a demanding standard. So as we're discussing reasonableness or excessiveness, we're discussing whether the law is clearly established or whether or not there was a constitutional violation. It was the demanding burden on the plaintiff to come forward with precedent that showed that the rights were clearly established and were violated and also to show that there was a violation of the Fourth Amendment right against excessive force as defined in those specific cases. The cases that are cited by Appellant in the briefing, Schumer and the other one that I noted was the Roshin case, aside from being 1950s, 1960s cases, Schumer was a Fourth Amendment case but not an excessive force case, and Roshin was a Fourteenth Amendment due process case. It also involved a home invasion, not a traffic stop. So there are all sorts of things that make those cases inapplicable, and we urge the Court to affirm the grantee of summary judgment, whether that's by affirming the clearly established prong or by finding that there was no constitutional violation under the Fourth Amendment. Thank you, Your Honor. But you didn't cross-appeal the Constitution. We did not. We did not. We were in the unenviable position referenced in the Pearson v. Callahan decision and made the decision not to cross-appeal but addressed it just as it came up in the appellants. Okay. I agree with your argument. Thank you. Thank you. Mr. Sanders. May it please the Court? Opposing counsel? Counsel stated that as soon as the officers became aware of the fact that she was an extremist that they initiated life-saving measures. I'd ask you to take a look at the video and also at the appendix to our brief to indicate that three seconds of warning followed by force, 22 seconds of struggle, and then one of the officers, Officer Caver, apparently angrily started trying to pull her out while she was still strapped in, got her feet tangled up, and it was only after that anger was exhibited was it clear then that her arm became limp. This is in the district court's decision or opinion, and so the court will see that the timing of it does not support what opposing counsel says, that as soon as they knew. In fact, there was a debate after she hit the ground where one of the officers said, Should we tase her? And only then did Caver say, No, she's eating a bunch of dope. Let's not. I don't think it's fair to say that there is an absence of malice, and one of the points we've raised, or absence of anger, is whether the district court improperly applied the test for determining what evidence there is in support of summary judgment. There are several cases. Your Honor was an author, I believe, of one of them, the Tarver v. City of Edna case. I couldn't recite the facts like you could, but you'll recall that in that case a portion of the case was sent back because there was evidence about doors being slammed on feet and then on heads or hitting that indicated that there was some basis to believe, and a jury could find, that the malice or anger of the officer would preclude the grant of summary judgment on qualified immunity grounds. We have also run across a case, Ray v. City of Columbus, not cited, but I believe it is referenced. It references Schmidt v. Gray, which is footnote 13 of our brief. So in any event, there is a body of law in the Fifth Circuit about how that is to be interpreted, and I don't believe the district court met the standard to evaluate the evidence in the light most favorable to us. Secondly, the White v. Pauley case is really, while it is from the Supreme Court, and I wouldn't say this if I were in front of the Supreme Court, but it's essentially irrelevant to our point here. That case had to do with essentially a gunfight at O.K. Corral. There were officers who arrived at various parts of the scene. He's not saying it's factually similar. He's just saying it states the principle, which isn't new in that case, that you need a closely factual case to show that there was a violation, to put officers on notice that their conduct was violating. I agree. But, Your Honor, it doesn't really add to the body of law that we have. It's been out there for years. Right. How do you get around Espinoza, the earlier Fifth Circuit case, given this case law saying it's your obligation to point to a case showing the officers had noticed what they did was unlawful? My recollection is that Espinoza is one of those ancient cases and well before Schmerber. I think it was a 1960 case. I see the court's looking at me kind of funny. Maybe I got it wrong, so I'm not trying to say I have all of these cases memorized. But I believe it's . . . He's told it's from 1960. Okay. So it's . . . But there's no . . . Can you point to a Fifth Circuit case? It says a more aggressive use of force to the neck was okay. It's your obligation to show this use of force was unlawful. Can you point to any Fifth Circuit case suggesting in this type of situation that this would be unlawful? Let me catch the court's distinction. I think the court's asking me can I show something that affirmatively says it's not okay as opposed to saying that the Fifth Circuit's dealt with this issue and it's not dispositive. And the answer is no, I cannot. But I would again point to Schmerber because Schmerber is the seminal case. It has never been overruled. It's not been modified. And it speaks to invasion into body cavities or below the skin surface. And because of that . . . This is an application of force to the neck. I'm not sure how it's an invasion into the bloodstream or something like that. Your Honor, securing evidence from the mouth is what was sought here. And the way to get that was to force it open. Imagine an imprecise surgery at Andersonville during the Civil War. They cut limbs off. They did it because that was a crude way of trying to get something done medically. That did not happen here. The court required precise, stringent, well-controlled processes if you're going to try to go into a body cavity. The mouth was where they were trying to go. And it is in that sense analogous. I don't think there is any case that takes away from Schmerber's general rule that everyone was on notice. At least that's my sense of it. The court may disagree. If there are no further questions, I believe my time has expired. Thank you for the court's courtesy. I appreciate it.